## R. PHILLIPS AND ANOTHER v. A. LESSER.

1—Judgment for a money demand rendered October 20th, 1865, on which the first execution was issued June 30th, 1868. *Held*, in view of the stay laws in force when the judgment was rendered, and of the issuance of execution within twelve months after the time (January 1st, 1868,) when executions were issuable under the act of November 10th, 1866, (Acts of 1866, p. 126,) that the judgment was not dormant at the time the execution issued.

APPEAL from Walker. Tried below before the Hon. N. Hart Davis.

The material facts are apparent on the face of the opinion.

*Abercrombie & Banton*, for the appellants.—I. Under the laws in force in the State prior to February, 1861, (see Pas.,

Arts. 3962, 4608,) every judgment of a court of record became dormant after the expiration of twelve months, if execution was not issued within that time.

It is true, the act of 2d December, 1863, P. Dig., Art. 5144, provided " that during .the time named in this act, (until twelve months after the ratification of a treaty of peace between the Confederate States of America and the United States of America,) or until otherwise provided by law, it shall not be necessary to issue execution, etc., to prevent judg-ments from becoming dormant;" but this act was held to be unconstitutional in the case of Luter v. Hunter, decided at the Galveston term, (1868,) and could not, therefore, change the law of dormancy of judgments. But it is contended that, while this law is unconstitutional and bad in so far as it sought to stay the collection of debts, provisions which are not obnox-ious to this objection are good; but we reply, an unconstitu-tional law is " absolutely null and void." (1 Kent, p. 495.) It has no existence, no foundation, nothing to contain a valid provision. As held in the case of Luter v. Hunter, " the acts were, in spirit and purpose, contrary to public policy, in aid of the rebellion, and were and are, therefore, void." This vitiated the whole act—every section and every provision.

Instead of suspending the valid laws in force on the subject of judgments becoming dormant, " until twelve months after the ratification of the treaty of peace," etc., it had no effect upon them whatever from its inception. That an act which was in spirit and purpose contrary to public policy, and in aid of the rebellion, and therefore void, could have the force to suspend a law even beyond its own existence, is simply pre-posterous.

II. What bearing have the proclamations of Gov. Hamilton upon the subject? None whatever.

1. Because he had no more power to impair the obligations of contracts than the Legislature, and his prohibition against the issuance of executions, after the machinery of the govern-ment was put into motion, was as nugatory as the stay-law

prohibitions. And this court evidently took this view of the subject in Luter v. Hunter. In that case judgment was recovered in the court of a justice of the peace, the same month and year this judgment was recovered. The defendant took the case up to the District Court by writ of *certiorari.* At the Fall term of the District Court, of the same year, and before there was any change in the laws, the case was heard, "the *certiorari* dismissed, and judgment for costs in the District Court rendered against the defendant, *precedendo* to the justice of the peace awarded, commanding him to carry into effect his said judgment." The District Court, by ordering the justice of the peace to carry into effect his judgment, could mean nothing else than to proceed to collect the debt by execution, the prohibitions of the stay law and the proclamation of Gov. Hamilton to the contrary notwithstanding.

2. Because, although the proclamation might have been valid and sufficient to stay executions, it contained no declaration on the subject of perpetuating the life of the judgment, thereby leaving that to be governed by the laws as they were aforetime.

3. Because the authority of his proclamations ceased when the government brought into existence by him was inaugurated, on the 6th day of August, 1866, and if the judgment had not become dormant up to this time, it certainly did after the expiration of twelve months, no execution having issued.

4. If the constitution and laws of the State were in abeyance, as argued, the sixth clause of Gov. Hamilton's proclamation of 25th of July, 1865, required that from thenceforth they should be respected and enforced; and while his subsequent proclamation may have suspended the execution law, it did not suspend the operation of the law of dormancy.

III. We come now to consider the effect of the 28th Ordinance of the Constitution of 1866, Laws Eleventh Legislature, p. 52, and the Stay Law of 1866, p. 126.

1. If the stay law and the proclamation of Gov. Hamilton did not have the effect to preserve the life of judgments with-

out execution, the judgment in this case had become dormant before the passage of the act "regulating the collection of debts" (11 Laws, 126), unless kept alive by the ordinance of 29th of March, 1866.

2. This ordinance, like the proclamation of the governor, sought only to stay the issuance of executions, and made no provision for preserving the life of the judgment, leaving it to be saved by the time-honored remedy of execution within the year, or to die. And here we would press the proposition, that simply staying the issuance of the execution does not, *ipso facto*, prevent the judgment from becoming dormant. The life of the judgment is, by positive enactment, limited to one year, and can be extended beyond this period on but *one* condition—that of the issuance of execution. And this condition contains no exception in favor of plaintiff's laboring under disabilities, such as minority, coverture, being beyond seas, or being prohibited having their executions. The necessity of execution to preserve the life of the judgment arises from positive law—that necessity can be removed only by positive law and not by mere intendment—or, as a consequence, growing out of the passage of another law.

3. But grant this position is not tenable, and that the stay of the execution operates a preservation of the judgment from dormancy; then we maintain that the ordinance of the convention was impotent to the accomplishment of this end, for the constitution of the United States is supreme, and if the law of the 10th of November, 1866, in postponing the collection of a debt in judgment, to one, two, three and four years, where the plaintiff, by the law of the contract, was entitled to its collection in six months, was a law impairing the obligation of a contract, and, therefore, unconstitutional and void, as was held in the case of Jones v. McMahan, by what show of reasoning can it be argued that the ordinance of the convention, (the supreme law in the State, it is true, but subordinate to the United States Constitution,) which would postpone the collection of the same debt for an indefinite period (until the

adjournment of the Legislature) is constitutional? If the one is unconstitutional, the other is also, and no power of sophistry can draw a distinction between the two to save them from the same fate.

But it is argued (and upon this view of the subject was founded the ruling of the court below,) that although the ordinance and the law were unconstitutional, in so far as they postponed the collection of the debt beyond, or changed it from the time prescribed in the law of the contract, and were, therefore, unconstitutional; still it might be regarded as such an expression of the legislative will as would preserve the judgment from dormancy, while it was powerless to stay the issuance of execution. This ordinance, however, had but one object—that of staying execution. It is a manifestation of legislative will to that extent, and no further; no other object can be drawn from its provisions, either directly or remotely. We have already seen, we think conclusively, that even a valid law, without an express provision, can not repeal or suspend a posi- tive enactment, and how an ordinance or law, without an express, or even an implied provision to that effect, and wholly without constitutional sanction, can have that effect, is a mystery we are unable to solve. When the Legislatures of 1862 and 1863 wished their stay laws to have that effect, they expressed it in unmistakable terms. That the Legislature of 1866 regarded the law on the subject of dormancy of judgments as it was prior to the rebellion, is evident from the first and third sections of the act of 9th of November, 1866, p. 118. In this act is an expression of legislative will on the subject of dor- mancy of judgments. In the stay law, and the ordinance, there is none.

But give to the ordinance all the virtue claimed for it, and it could only preserve the judgment until after the adjourn- ment of the Legislature—13th of November, 1866. We have seen that the stay law only sought to stay execution—not to regulate the lien or dormancy of the judgment. The law on the latter subject (p. 118, Law Eleventh Legislature) made a

change in the law of lien, and extended the life of the judgment, *between* executions, to ten years, but left the limitation of one year, before first execution, still the law. Over one year expired after the adjournment of the Legislature before the issuance of the execution, and the judgment, if not already dormant, became so. Viewing it in every light, the judgment was dormant at the date of the issuance of execution; the execution was, therefore, void, and should have been perpetually enjoined.

*Baker & Maxcy*, for the appellee.—After the rebellion was crushed, and until the proclamation of Provisional Governor Hamilton, of 25th July, (1865,) the constitution and laws were silent in this State; but that proclamation revivified them, except in so far as the latter were rendered inoperative by the result of the war, or limited, restrained or enlarged by the provisions of the proclamation.

The courts were opened by his proclamation of September 8, (1865,) and parties permitted to institute their suits; but in actions of debt, were inhibited from proceeding to judgment until the removal of the prohibition.

On the 25th September, (1865,) his third proclamation was issued, permitting the courts to "proceed to final judgment in actions of debt;" but inhibiting the issuance of execution "until otherwise ordered." These proclamations will be found in Sayles' Treatise, pp. 849, 852; and it is insisted that under the last proclamation no execution could issue until *otherwise ordered.*

No further order was made upon this subject until the convention of 1866, which provided in the 28th ordinance that "there should be a stay of execution upon all judgments before then rendered, until the adjournment of the first Legislature convened after the adjournment of that convention; leaving the matter with the Legislature to grant relief." That Legislature met on the 6th of August and adjourned on the 13th of November, (1866,) making no other provision upon the subject

than the stay law, (p. 126, Eleventh Legislature,) the first section of which provided that no execution should issue on judgments rendered prior to the 1st of January, (1867,) until after the 1st of January, (1868.)

In Jones v. McMahan *et al.*, decided at the Galveston term, (1868,) the Supreme Court held this law unconstitutional, in so far as it inhibited the plaintiff from having his execution for the full amount of his judgment, which was rendered in 1866. But it is respectfully insisted that that decision, which is admitted to be well ruled upon the law and the facts, as presented to the court, does not dispose of or control the question in this case.

In the 28th ordinance of the convention in 1866, the question of relief upon this subject was expressly referred to the Eleventh Legislature ; and by force of that ordinance no execution could issue until the adjournment of that Legislature. That body had the right to say when parties should have their execution, because until then the issuance of all executions had been prohibited, and the question, when they might issue, had been referred to that body by the convention. That Legislature might have permitted them to issue immediately after its adjournment, or might have prescribed any reasonable time, after the lapse of which they might issue ; and this, we apprehend, would have been held a legitimate exercise of authority ; provided the act did not afterwards interfere with the creditor's right to enforce payment, as he could have done under the law of the contract.

In the first section of the act of 10th of November, 1866, commonly called the stay law, that Legislature did say that " on all judgments rendered prior to 1st of January, 1867, the debtor should have twelve months thereafter within which to pay one-fourth of the judgment and costs ; *and no execution should issue until the expiration of the time allowed ;*" " and then only for the instalment due, and costs."

Here was the exercise of the right referred to the law-making department by the convention. It is true that the act went too

far, as will be subsequently shown; but the excess or abuse of authority cannot prejudice a rightful use of it. That Legislature has plainly said that no execution shall issue until the expiration of twelve months from 1st of January, 1867, which would be the 1st of January, 1868. Suppose it had said "no execution shall issue until 1st of January, 1868," and nothing more, could it be seriously, or even plausibly argued that such an act would have been unconstitutional, because that it impaired the obligation of contracts? We think most certainly it could not; because the obligation, so far as it is found in the remedy, had already been suspended by a higher power than the Legislature; and then stood suspended, awaiting the action of the Legislature, to say when or how soon the suspension should be removed. This was the legitimate question referred to that body by the convention. Governor Hamilton had suspended the right to an execution, which suspension continued until the convention met in 1866, and the convention continued it until the adjournment of the Eleventh Legislature, expressly submitting it to that body to say when the suspension should be removed; and it has said that no execution shall issue until the expiration of twelve months after the 1st of January, 1867. But the act does not stop here. After fixing a time from which the suspension should be removed, it then changed the rights of the creditor from what they were under the law as it was at the time the contract was made, and which was part and parcel of the contract, as was said in Jones v. McMahan *et al.*, by giving the debtor four years within which to pay; instead of allowing the creditor his execution for the full amount to be collected within six months, as was his right under the law of the contract. This was the vice in that act; this it was that made it unconstitutional; and for this reason the court so held it.

By reference to the case of Jones v. McMahan *et al.*, and we respectfully ask it specially, we think it will clearly be seen that the question was decided wholly upon this ground. In that case the court say: "By the law then in force, (referring

to the date of the contract, which was the foundation of the judgment,) the law required the whole sum to be collected in six months after judgment. The act of 10th of November, 1866, provides that the judgment may be paid in four equal annual instalments. And it thus appears that the legal obligation, as to the time of performing the contract, has been changed from six months to one, two, three and four years." Again :

"We consider the creditor had a right to have *such* an execution as would not materially and essentially differ from the one as then provided by law." Thus it appears, as we think, that the reasoning of the court proceeded entirely upon the ground that the law changed the creditor's rights essentially from what they were under the law of the contract. It was in this respect, and this only, that the act of the 10th of November, 1866, was considered in violation of the State and Federal constitutions, and therefore void. If void only for this reason, then it follows that only so much of the act is void as affected the creditor's rights after his execution was allowed him ; and that portion of the act which inhibited execution in all cases until 1st of January, 1868, is not to be held void for anything decided in that case. In truth, the point as here made, was not presented in that case, so far as we can judge from the newspaper publication of it ; and we need not cite authorities in support of the well-recognized principle that a law may be good in part, though bad in part.

That so much of the stay law as interfered with the rights of creditors after execution was allowed them is void, because that it impaired the obligation of contracts, is clear. But it can not be said that the declaration of the Legislature, that " no execution shall issue until twelve months after the 1st of January, 1867, " impaired the obligation of contracts. Why ? Because, at the time it was made, the creditor had no right to an execution. It already stood suspended by higher authority than the Legislature. No obligation then existed which he could enforce by execution ; and if none existed, certainly none could be impaired. Instead of impairing it, the act prescribed

a time after which he might enforce it. But it is admitted he could not be compelled to enforce it *in the manner prescribed by this act.*

This act was certainly an expression of the legislative will that no execution should issue until 1st of January, 1868; and the convention having referred the question to the Legislature for this purpose, the act must at least be considered as directory in its character.

If so, then while it is true that the creditor was not bound to observe it, yet, if he did observe it, he lost none of his rights thereby. He was not bound to disregard this law at his peril, though it was afterwards held to be unconstitutional, and it is insisted that, until so held, none lost their rights by observing it as a rule of action. It is within the knowledge of all that, until the decision in the case of Jones v. McMahan *et al.*, parties could not procure executions—the clerks would not issue them; and we presume that such a construction will not now be put upon the law as would have compelled every judgment creditor in the State to resort to a *mandamus* against the clerk, or lose his right to an execution on his judgment.

The remedy by injunction belongs to the equity side of the court, and we submit that appellants' bill shows but little equity on its face, when its only merit consists in the alleged failure of appellee to test the constitutionality of a law under which the appellants have taken refuge and claimed exemption from execution since the rendition of the judgment against them.

For these reasons it is insisted that this case does not come within the rule laid down in North v. Swing, 24 Texas, 193, and the judgment of the court should be affirmed.

And, inasmuch as appellants do not complain of the judgment, or allege any payment or effort to pay, appellee suggests that this appeal is only for delay, and asks for damages on affirmance.

MORRILL, C. J.—In October, 1865, Lesser obtained a judgment against Phillips upon a note, and on the 30th of June, 1868, caused an execution to issue thereon.

This execution was enjoined at the instance of the debtor, because, being the first on the judgment, and not being issued in twelve months after the rendition of the judgment, it was ·dormant, as alleged.

The act of the 5th of February, 1841, Art. 4608, provides that "judgment in any court of record within this Republic, where execution hath not issued within twelve months after the rendition of the judgment, may be revived by *scire facias*," etc.

At the time this act was passed the execution law of the State required executions to be issued by the clerk in every case, from and after the rising of every court.    (Art. 3772.) But if a debtor should voluntarily pay a judgment, and the clerk should have legal evidence of that fact in his office, he would be acting illegally to issue an execution simply because ·the judgment had been executed voluntarily.

There can be no doubt that the reason of the passage of the act virtually declaring a judgment dormant upon which execution had not issued in twelve months, was because it was to be presumed that it had been paid, and this presumption was based upon the law requiring executions to be issued semi-annually until they are paid.   And therefore the act is to be ·construed as if it had declared a judgment dormant, if executions were not issued in twelve months, from and after the time the same are issuable.   The act is, in fact, an act of limitation.

At the time the judgment in this case before the court was rendered, the execution laws were suspended, and no execution could, under any circumstances, issue till the 1st of January, (1868.)   (Act of 1866, p. 126.)

The execution was issued in June, (1868,) within twelve months from and after the time permitted.

Applying the well known law maxim, "*cessante legis ratione,*

*cessat ipsa lex,* (Brown's legal maxims, 118,) and also *qui hæret in litera hæret in cortice,* (Id., p. 534,) the case is free from all difficulty.

The judgment dissolving the injunction is affirmed.

Affirmed.